Our final case this morning is number 2012-1282, WINEGARD CO v. ELECTRONIC CONTROLLED. Mr. Scarr, am I pronouncing that correctly? Yes, you are.  Good morning, Your Honors, and good morning, Mr. Winegard and Mr. Waterman. This appeal was taken from the district court on the issue of whether there was sufficient evidence presented to the jury to support their finding that the seven patent claims in suit were invalid as obvious. The main complaint on appeal by King Controlled is that uncorroborated oral testimony was used primarily to establish claim limitations, the ones in dispute, that there was no motivation articulated to use any of the two prior references that were at issue to show how those other claim limitations might be attained. The expert used hindsight by using the patent claims as goals for his testimony. Do you have to have motivation in every case that involves obviousness? I think that there has to be something articulated. Whether the motivation actually is in the prior references itself, I think that's been broadened. It doesn't have to be, but I think there has to be something articulated based on the evidence. Articulated, in what way articulated? How about if the inventor says, you know, I think I can improve on this. I'm making it smaller, more compact. Is that sufficient motivation? Motivation for the inventor? Yes. Certainly. So that for purposes of a later obviousness determination, that's motivation. It doesn't have to be some piece of prior art or some publication that says, hey, you can improve on this by making it smaller. Well, I think that the motivation has to precede a critical date. So using the inventor's own motivation, well... Would be okay. Well, perhaps. Perhaps. I haven't thought that through. I want to be sure that we were on the same page on whether you need to find a piece of written motivation or teaching somewhere in the prior art. If the inventor's own motivation were to make it smaller, your point is you'd still have to find that there was a motivation before the critical date to make it smaller. Or somebody else's motivation. Otherwise, you're using the patented invention as kind of a blueprint. And I think in this case, the jury needed to hear something that they could find the motivation on, find motivation for. One of your major points seems to be that there was no corroboration for the rear L&D configuration being known as early as World War II, right? Correct. But my understanding from our case law is that something like that doesn't have to be corroborated. There's a case of ours in Ray Reuter, which... Well, I guess that's the case for that. 675nd 1015, which seems to say that an expert can testify as to what was well known in the art. And there, the testimony was about something well known as early as the 1920s. So do we really have to have corroboration on something which was well known in the art at some earlier point? Well, I do think there's a dispute over whether it was well known, so I think there has to be some. I mean, according to the record, there isn't any documentary evidence. And if it was well known, then why couldn't there be at least one exhibit showing, you know, here's a rear L&D configuration? Well, maybe there could have been, but it seems to me that there's not a requirement. And what this case says is the expert's, quote, factual statement regarding the state of the art, known to him in his capacity as an expert, is that the use of equal line lengths to simplify main factors well known as the early 1920s, absent any contrary evidence, is entitled to full consideration. That seems to be pretty much in point. Doesn't that sound... Yeah, well, I think there's, I think his testimony is there are rear feeds known back in World War II. Of course, there couldn't have been rear L&D configurations known, because the L&D was developed for home satellite TV reception, which is a relatively late phenomenon with C-band in the 1980s. So even if there was, his testimony isn't sufficient to establish that it was well known in the prior, just by saying it, because he's not addressing a claim on the patient's. A rear feed that has an L&B on it couldn't have been known in World War II, couldn't have been known as early as 1945, I can't remember, 1947, whichever the date was, because, in fact, it's not possible there were no satellite signals going on. So you need an L&B, so you need a satellite. And so his testimony that it was well known, I still think needs to be corroborated. I'm looking at, you know, he's testifying to a, basically, a prior public use. Is it your position that rear L&B converters were not known in the art at the time of this invention? That's correct. Not known in this application, that is correct. Okay. And were they known in this application? Was it known in other applications? I think it was used, I'm not an expert on this, but my understanding is that they didn't invent the rear feed. There's different things that might be on the back side of this dish, it's not necessarily an L&B. An L&B is what home satellite receivers have, like the one in your house you might have that sits on the end of an arm, that's a front L&B, and they used a rear L&B. And the prior art had rear feeds, in other words, they had the round dishes that had something at the apex of the dish to do something to the signal. They weren't necessarily little noise block converters, but they were L&Bs. And so the fact that his testimony really is that there are rear feeds now, and there is no dispute about that, but what he didn't testify to and what there is no evidence for the jury to chew on was the fact that there were rear L&Bs known. And if I read Dow and Finnegan correctly, what they're saying is if somebody's testifying to a prior public use, which this really is, and he's saying that they were in use, well then you have to have corroboration. What do you understand the expert to have been saying when he said that the L&B, the rear L&B configuration was known as early as World War II? I have no idea. I didn't get to see the book he was referring to that I kept out of evidence. He was saying that I have a book that shows it. I object because after a few years of discovery, I'd never seen this book. So I don't know what he was testifying to, so all I can do is apply logic to it and say... So if you'd let the book in, we might have known. We might have known, but I would do it on the fly. But I did ask for this stuff. I was asked for this information during discovery, and I didn't get it. And we did a lot of time. We spent two years in discovery and never got any evidence of a rear L&B from them, and they were supposed to give me that stuff. And so I thought it was inappropriate for them, and it wasn't in the next report. So did you object to the testimony? Yes. On what grounds? Well, I objected to the book on the grounds that it wasn't provided in discovery. You objected to his testimony? I did, and that was overruled a second time. And the objection was based on what? That it was based on this book that was not in evidence. And you didn't raise that in your brief here, right? I did not appeal that issue because I felt that corroboration was necessary, and I didn't feel he corroborated. Again, relying on Dow and the fact that really he was being a fact witness at this point. He was testifying regarding the state of the prior art, and according to Dow and Finnegan, that requires corroboration. And I'm not familiar with the case that you're citing here. I haven't read it, I have to admit. But the corroboration issue to me was required. He can go up in the stand and say everything is known by one of the skills we have. Well, then we don't have too many valid patents left because that makes it extremely difficult to dispute that, especially when it wasn't disclosed prior. The other issue is regarding the hindsight problems of the weight limitations. And the weight limitations, his testimony, the same expert Bruce Albert's testimony was that he thought those weights could have been achieved by modifying the prior art. And the prior art in this case was two references, the 749 King patent, one of our client's patents, and the TCS, the brochure, and the kilometer unit, the military grade kilometer unit. And he was saying, well, you could, one skilled art would know how to modify that and make it lighter by using lighter weight parts. What's wrong with that? When I asked him, okay, let's start doing some of this in the courtroom here. And I asked him, you know, how much did the mortars weigh to start with in the TCS? And he said, well, I don't know. In fact, I don't even know how much, whether lighter weight mortars were even available.  He didn't try to do it, and he didn't have any basis for his testimony. There's no underlying data as required of 702. Let me get your reaction to a statement from Leapfrog Enterprises v. Fisher Price, which is a decision of this court in 2007. This is what we said. We agree with the district court that one of ordinary skill in the art, this happens to deal with children's learning toys, of children's learning toys, would have found it obvious to combine the Bevan device with the SSR2, update it using modern electronic components in order to gain the commonly understood benefits of such adaptation, such as decreased size, increased reliability, simplified operation, and reduced cost. Do you have a sense for whether that's applicable to your case? Yeah. Well, I don't know if it's applicable, but I think our case is different than that. I mean, what we've done here is what people didn't think was possible, and that is make the dish so small that it could still receive a satellite signal, and that's part of the disclosure in the patent application are these ratios of dish size to the volume of the enclosure, which is really kind of the enabling part of the patent showing how small you can actually make a dish. And prior to that time, it was not believed you could make a dish that small and still receive one of these satellite signals from a direct TV or a dish network satellite. So it's not just a matter of making something smaller. It was thought that it couldn't be done. And, again, it wasn't made into an issue at trial. I mean, they didn't argue enablement or adequate disclosure or even criticality. They did early on. But they did argue that there was a motivation to make it smaller, right? The motivation, they said, to make it smaller came from the patents. Came from the patents? Right. That's what they said. I asked him where he got his motivation to do all this, and he said, well, it's to make it portable. We're the only portable dish. And so we're the only portable automatic dish. Wasn't there an admission to using parts, the same type of parts? Yes. There is an exhibit where they use the parts from our satellite dish and try to make it portable during their development. So they're actually using the dish, which was, if you look through the testimony of Sam Schuster, who was one of the inventors, trying to find this dish that was so small that it would still receive a signal was the real hard part of the invention. It took him almost three years to do that. And this is something that Weingart just put into theirs. The change of the size of the dish, what was that caused by? Was it caused by a desire to seek less weight, or was it because there was a change in the band width for satellites, enabling smaller dishes to be used? Well, the idea was to make it portable. Here at Ford, people made them big and screwed them to the top of the roof so they were bigger to be used in their trucks or whatever, and they had this idea that they could actually perhaps make one small so you could carry it around, which had never been done before. The manual dishes that you would carry around, you had to manually aim, and they weren't very popular because they were hard to set up on a campsite. But the idea here was to make one that was actually portable, and light enough to be portable. So the design here wasn't necessarily to make it a certain weight. The design was to make it small enough, and then it turned out to be a certain weight, and that's what they called it. Can I answer your question? Sorry, you're into your bubble time. Mr. Waterman? May it please the Court, I'm Bob Waterman for Winegard. First of all, I wanted to address a number of points. We were asking that the Court affirm the jury verdict and the denial of the post-trial motion. None of King Control's parts were used in the Winegard antenna. Winegard used its own parts. The reference, Your Honor, to there being similar names was a placeholder that was used early on when they were mocking up and deciding how to use and build their own satellite. Do you feel the mock up? Were you sizing and using parts from the other? No. No parts from King Control's were used. What we have to remember is in a satellite dish of this type, and it existed, even from, I think you mentioned C-band. Those were the great big ones that were in people's yards. Later, I think in the 80s, it became a KU band, and that enabled the use of the small ones that goes on the side of the homes. Another thing to keep in mind with this technology that you just heard about carrying around, it's carrying around from your RV. It's not like you can walk to a football game up into the stands with it. It's still tethered to a cord. So they're all really the same. The technology's all the same. They all have the same parts. There's a reflector. There's a low noise block. Speaking of the low noise block, that's been in existence since there have been these satellite dishes. Whether you put it in front or behind, that's a decision. So how about going back to World War II? There weren't any satellite dishes. No, there weren't satellite dishes there, but there have been satellite dishes in the last 30 years, and it's been well known by persons skilled in the art that they exist, that you must have them, and that they can go either in front or behind. Would it be erroneous to say that this went all the way back to World War II? This technology, low noise blocks, that technology, I believe, is accurately, as said by Mr. Albert, goes back to World War II. There weren't satellite antennas in World War II. That came later, but what he testified about is these components. It's known by persons skilled in the art to reduce weight. That's obvious. It's known by people skilled in the art to put on a handle. That's obvious. What does the low noise block do? It takes the signal and projects it into the dish. Speaking of these dishes, there's no such thing as a low noise block without a satellite antenna. Every satellite antenna is going to have low noise blocks. It's just a simple question. To the extent that he said it goes back to World War II, that can't be right, right? To the extent there's a configuration either in front or behind that goes back to World War II is correct. Front or behind what? The dish. The dish that he was referring to. Also, there were no dishes in World War II. Well, there was no TV in World War II. So, in World War II, there were no satellite dishes. I'd have to refer to his specific testimony as it relates to what he said. What he said was… Well, the Geertzberg said that there was. He said that this goes all the way back to World War II, and he was specifically talking about the low noise block. Okay. Well, if that's his testimony, I believe that was accurate testimony. One thing to keep in mind is the testimony was never shown. How can it be accurate testimony if a low noise block has a function related to a satellite dish, and satellite dishes didn't exist back then? Your Honor, I'm not sure whether it's limited to satellite dishes or not. What his testimony was is this technology goes back to World War II, and importantly, none of his testimony was challenged, impeached, or rebutted. That's what he objected to, the testimony. Okay. He objected only to his reference to a book that the court had excluded at a prior art, at a motion and limine hearing. That book and the title of it, as well as all of his opinions, were disclosed timely, more than six months before trial. The first time any of these issues, as they relate to corroboration, if you do a word search, the first time that word is even mentioned is after the close of evidence in chief. Mr. Waterman, his testimony is on Appendix 404. Okay. And in that testimony, you asked him how common are rear feed LNBs, and his answer was rear feed LNBs are almost as common as front feeds in the motorized antenna field. Okay. So apparently he was not talking about satellite receivers. He was talking about motorized antennas. Thank you, Your Honor, for clarifying that. And then he goes on and says there was a standard book, came out in 1947 after the Second World War, and collected all of the research. That particular book has drawings in it of the front feed and the rear feed. We can't tell exactly whether he was still talking about motorized antennas, but presumably was, and that's when Mr. Scarr objected to the book. Why didn't you get the book in? That book had been part of a prior art disclosure that had been made to the court early in the case when we referred to our disclosures at the Patent Office, the PTOs, and we made a general blanket incorporate by reference all of our prior art and supporting evidence as we had disclosed in the PTO, and the court found that that was an inadequate disclosure of our prior art and excluded that book. That book was described in Mr. Elbert's 90-some page report. But I think you've got – I agree with my colleagues. I think you've got a problem on corroboration of that particular testimony without something other than his generalized idea that – Here's what he says. He says, there was a standard book which I didn't write because it was written before I even graduated from college. Well, even if you got that book in, there might have been a question about it, but without any corroboration, he's just giving an opinion about the status of things before he graduated from college. As I understood it from all of his testimony, it was his opinion as to what a person skilled in the art would know, and that it is known and there was no evidence rebutting it that there wasn't low-noise blocks before either behind or in front of the dish. Well, perhaps the book would have rebutted it. The testimony goes to obviousness and whether it would have been obvious for a person skilled in the art to know to put it in front or behind the dish. His testimony was, that's been known since dishes were around. In fact, as Your Honor points out, his testimony was, that's been known since motorized antennas were around. That's what I was just going to say, since motorized antennas referring back to the World War II. Now, when we get into corroboration, as I understood it from Finnegan and from Thomas and from the cases since then and the articles to be cited, that that's been limited to a Section 102 anticipation or novelty challenge where you've got testimony at trial, oral testimony saying, I saw that barbed wire. We've got 24 people that came to trial and said, I saw that barbed wire before, years before in Farmer Jones's field. And the court found no. That's not corroboration because you're just saying you saw something. Here we're talking about Section 103. Well, counsel, in Dow Chemical, we said that corroboration is required of any witness whose testimony alone is asserted to invalidate a patent. So it really doesn't matter whether you invalidate the patent under 102 or 103. This testimony was being asserted to invalidate a patent. And under Dow Chemical, we say you need to corroborate that. Well, under Reuter's rule of reason, when you looked at is the testimony credible, was the testimony challenged, we know that the testimony was not challenged. There was no evidence, counter evidence, that said there hadn't been low-noise blocks before. The only evidence in the trial was the unrebutted evidence of Mr. Elbert, that they were known for more than 40 years, that it's common, almost as common, to put it in front of it as it is behind. All of his testimony stood unrebutted. The trial court and the jury were the ones in a position to assess credibility on this high burden. You know, we protect patent holders through a clear and convincing burden of proof. That's one element, one thing we require, not to mention the federal rules of evidence on hearsay and foundation that are required to protect the patent holder. For policy reasons, we don't want to set up a standard where you have to have an X. And by the way, experts have never been held by this court to require corroboration. Corroboration has come in when there's been a single witness who's been asked to testify, who's not an expert about events that he or she saw. In this case, it was contemporaneous opinions that were offered by an expert witness based on his review and expertise in the file. Are you an inter-parties re-exam before the PTO? Pardon me? Are you an inter-parties re-exam before the PTO? The PTO has completed, as I understand it, all of its rejections of both patents and those have proceeded to, I'm not sure at what level they are, whether King Controls is appealing those or not. Okay, that's not part of the record before us, is it? Your Honor, that's in the court record. We sought to continue and stage the trial pending completion of the PTO findings and that appeal because it had found both patents invalid. After three attempts to stay that, each time after a new finding by the patent court or the PTO, it was denied, we went to trial. I understand that that has continued. Counsel, let me take you back to the testimony of the expert regarding the book and World War II. On page 404, and I'll start at line 9, they're talking about the rear feet. So you're talking about the noise block, whether it can go in the front. And the question, and tell me if I'm wrong, but it seems to me that the testimony was being offered in order to show that it would have been obvious to put it in either location. Correct. Okay? Correct. Whether it's an antenna or a satellite dish. Correct. Okay. And then he goes on and says, would it have been obvious to put it in either location? He goes, yes, for example, and he goes on and relies on the particular book. I just wanted to make sure that the testimony was being offered not with respect to dishes or whether something's a motorized antenna or not. It was being offered to show obviousness with respect to the placement of the low noise block. In the context of his testimony, we had up on the screen for the jury each of the prior parts, each of the components for each of the claims, and we went through and we had them explain the evolution of antennas, how they came about, the purposes for each of the parts, and how, for example, the low noise block had been in existence for satellite antennas since they started and motorized antennas since World War II. It was simply to demonstrate what we argued, that this technology is pretty fixed. Well, this case came down to, which is in the record, is we have an identical product by Weingart called the Minimax. It is absolutely identical to the Carryout according to their expert and our expert, and they stipulated, team control stipulated that the Minimax did not infringe any of the claims at issue, but that the Carryout did, and the only difference between the two is the Carryout came with a little plastic handle in the box that the owner could screw on. This case came down to whether a handle was an invention. That was certainly one of our trial themes. As it relates back to corroboration, as I've mentioned, I believe the precedent is for experts, they've not been required to be corroborated in the Section 103 nor in 102 situation. And this is the Section 103. It doesn't have, I think, the problems that come into play with faded memories and the like that you have in the Section 102 challenge of memories as to whether the product existed before. We can disagree over whether 103 requires corroboration. Let me ask you about the foot problem, an issue of some interest to me. You argued that it was obvious because of this vertical bolt. Two things. Why didn't you just argue that it's obvious to put feet on a device that's supposed to stand on something? I mean, he testified at trial. KSR would certainly support you in that. Absolutely, KSR does. It's not a rigid formula of what's obvious. You take everything into consideration and a person is skilled in that.  I mean, you relied on this vertical bolt, which seems to me to be questionable as to whether that's sufficient evidence for a reasonable jury to go anywhere. Well, we also relied on TSC 600, which came with feet. That's a prior art that was in evidence that had feet. So we had two things that we relied on, the prior art with pictures that were up on the screen for the jury to see and how it had feet, as well as the patent 749, which had, I believe it was outward protruding bolts, which our experts said, you know, if you have feet, those can be bolts they can attach. One of the questions was whether a person skilled in the art would know that you could take a bolt and attach it to something, attach the antenna to something. It was our argument and the testimony from our experts, again, unrebutted. None of the evidence introduced to trial on any of these issues, whether it was the handle, the weight, that everyone knows. Mr. Valen, who was their expert, wrote a book about it that I brought out and had him talk about at trial, about how it's been known since the 70s how you can have a 14-pound antenna. All right, well, Mr. Waterman, I think we're about out of time. Let's throw the question. Thank you very much. Mr. Skouro. I just have three minutes. I don't have too much to add because I think I covered most everything. I just wanted to point out this issue regarding the copying, and it's on A1038, where they have a parts list for their whip, which we established, the disc they were developing for the carry-out, and the fact they developed a carry-out in this other product that Mr. Waterman mentioned at the same time, the one that models the one that doesn't model. But you can see on the parts list on A1038 where it says Wallace Disc, which was the producer of our product at that time, Wallace Horn, and Wallace Sub-Recollective. And then the little note below says, can you please provide a status on these parts? Well, Mr. Waterman's argument that they never used these parts in their prototype, I think, is not very credible. I mean, why are they doing this? And knowing that our major standard parts. These are standard parts. No, the Wallace Disc, of course, and if you look at the testimony of Sam Schuster, the disc that he spent two years trying to get small enough so he could actually make a portable device. So it actually is an extremely important part. And, of course, the disc size determines the horn size and determines the sub-recollective size. So all these three parts here, that represents a large part of our investment in our invention that they just took and threw into their prototype. And I say that that cuts against the non-obviousness of the invention because it's something they couldn't do on their own. They had to ask us to do it. So, that's that. Okay. Thank you, Mr. Scott. Thank you. I thank both counsel for being so committed. And that concludes our session for today. Thank you. All rise.